# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2546

_____

Marjorie Tramp

*Plaintiff - Appellant*

v.

Associated Underwriters, Inc.

*Defendant - Appellee*

------------------------------

AARP

Amicus on Behalf of *Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 13, 2014
Filed: October 7, 2014

_____

Before RILEY, Chief Judge, BEAM and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

Marjorie Tramp appeals from the district court's grant of summary judgment in favor of Associated Underwriters, Inc., on Tramp's claims of wrongful termination on the basis of age and disability in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et. seq., and the American with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq..[1]  We affirm the district court's dismissal of the ADA claim but hold that Tramp has presented a submissible case of age discrimination for determination by a fact-finder.

## I.    BACKGROUND

Associated Underwriters hired Tramp in 2000.  In August 2007, Greg Gurbacki and Chris Hallgren purchased the company.  At the time, Hallgren served as president and Gurbacki ran the office, in charge of the hiring and firing of employees.  In 2007, Associated Underwriters operated at a loss; a reality that did not change during the relevant time period.  Because of the existing economic difficulties, Associated Underwriters underwent a reduction-in-force (RIF) in 2007 and terminated seven employees.  Gurbacki decided who to let go based on his opinion of the quality of the employees' work.  Tramp retained her job at the time, although Gurbacki had concerns about her job performance.

In July 2008, Associated Underwriters still faced economic difficulties.  To save money, Gurbacki suggested they eliminate the company's health insurance program.  Hallgren disagreed, and the two instead pursued other cost-saving measures.  That same summer, however, Associated Underwriters experienced a significant increase in its group health care plan premiums.  Accordingly, Hallgren sought proposals from different companies, which required him to provide the

---

[1]Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (ADAAA), which became effective on January 1, 2009.  See Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. § 12101).  All references to the ADA in this opinion are to the Act as amended by the ADAAA.

demographic information of his employees to obtain the quotes. One quote came back much lower than others and upon investigation, Hallgren learned that the insurer had not, in fact, included in its quote Tramp and another employee, Barb Treadway, who were both over the age of 65. A representative from the insurer explained to Hallgren that this was because people over the age of 65 "usually don't get quoted" as they are Medicare eligible. Regardless, Hallgren asked the company to adjust the quote accordingly to include the two employees and the insurer provided a revised, and much higher, quote.

Emails between Gurbacki and the insurance company during that time frame reveal conversations concerning rate discussions specifically as they related to the health and age of the employees at Associated Underwriters. For example, Gurbacki asked their provider to "relook" at their rates, specifically noting that two employees over the age of 50 had left the company.[2] Later, Gurbacki updated the demographic information by sending an email stating, "We have now lost Sue Witchell and Gayla [M]artin as well," at least one of whom was likewise an older employee. Finally, Gurbacki made it clear that Associated Underwriters was seeking other bids for insurance and reiterated "[w]e have lost several of the older, sicker employees and should have some consideration on this."

It was at this time that Hallgren believed a substantial savings in health insurance premiums would benefit Associated Underwriters' bottom line. Hallgren met with Tramp and Treadway in July 2008 and suggested that they utilize Medicare instead of the company's health care plan. Hallgren claims that in this meeting he offered to cover 100% of a Medicare supplement, which Hallgren believed would

---

[2]Gurbacki's email states, "I just want you to relook at our rates, Jim & Shari Devine have left the company effective 8-1-2008. They will not need to be on our renewal, also Chris advised me that both of them had health issues that we would not need to be rated for." When forwarded internally, the insurance provider pointed out that the named employees were 54 and 51 years old.

provide better coverage for the employees, and simultaneously cut costs for the company. Tramp denies that Hallgren offered to provide such supplemental coverage. Tramp and Treadway declined Hallgren's offer and remained on Associated Underwriters' health care plan.

Gurbacki testified that he regularly evaluated his employees, reviewing various aspects of their competence and success, including how they treated customers and how they completed assigned tasks. Gurbacki considered Tramp the least efficient performer among the employees, in part, because she questioned Gurbacki on various business decisions. Gurbacki added that Tramp did not want to cancel certain policies because it would have been "harder" on her to do so. Tramp repeatedly failed to cancel insurance policies when asked to do so and Gurbacki thought Tramp was incapable of helping customers transition smoothly between their then-current insurer to Associated Underwriters' insurers.

In October 2008, management formally reprimanded Tramp for poor performance, providing three examples as documentation: (1) Tramp mistakenly added the same vehicle on two policies; (2) Tramp cancelled insurance coverage for a house located in a hurricane zone resulting in a higher premium and deductible when the customer tried to reinstate coverage; and (3) Tramp failed to cancel policies in addition to causing renewals to be sent out when the policies had already been stopped. Along with receipt of the reprimand, Associated Underwriters placed Tramp on a 90-day probationary period. The probation period ended in January 2009. Gurbacki further claimed that there were other problems with Tramp's performance that were not included in the formal reprimand, including her uncooperative attitude, and that Tramp received additional verbal warnings.

In February 2009, Associated Underwriters underwent another RIF and Gurbacki made the decision to lay off four employees, including Tramp. The other three employees terminated at that time were Treadway, 72 years old; Stacy Bell, 38

-4-

years old; and Andrea Altrock, 39 years old. All three worked in a different area than Tramp. Gurbacki asserted that he did not base his decision to terminate Tramp on her age, nor because Tramp refused the suggestion for alternative health care coverage. Instead, Gurbacki stated that he chose to include Tramp in the 2009 RIF because of her historically poor job performance. Associated Underwriters did not replace Tramp following her termination, but rather divided her job duties between four remaining employees in the personal lines department, aged 49, 46, 25, and 66.

In July 2009, additional emails reveal conversations between Gurbacki and the insurance provider wherein they revisited their health insurance rates. Gurbacki wrote:

> I just received the renewal rates for Associated Underwriters. I[f] I am reading this correct your proposal shows that we are getting almost a 25% increase. This will not be acceptable. Last year I know we spent a whole lot of time working and had no plans on remarketing, but if this is your best pricing we will have to go to market again.
>
> Since last year we have lost our oldest and sickest employees, Jim & Shari Devine are no longer here, Barb Treadway and Marjorie [Tramp] are no longer here. Please let me know if this is the best we can do, what choices we have with you as I know that Chris and Jeff Mann would like to stay with you but we were expecting a rate decrease from the group becoming younger and healthier not an increase.

Tramp sued Associated Underwriters, alleging a single theory of recovery, claiming that she was harassed, retaliated against, and terminated based on her age, race, disability, and sex.[3] As to her claim under the ADA, Tramp asserted that she

---

[3]The district court pointed out, however, that "[d]espite the varied legal authority cited in [Tramp's] Complaint, she . . . conceded in her response to [Associated Underwriters] [i]nterrogatories that she is not seeking recovery for any discrimination based on race or sex," so the district court only addressed the claims

was disabled under the ADA because of knee pain that limited her ability to perform her daily tasks. To remedy that pain, she scheduled arthroscopic knee surgery, which Tramp claimed would have resulted in additional limitations during her period of recovery. She claimed that Associated Underwriters was aware of this scheduled procedure and terminated her employment the day before the surgery was to take place, in violation of the ADA.

The district court granted summary judgment in favor of Associated Underwriters, relying heavily on the Supreme Court's analysis in Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993), to resolve Tramp's claim under the ADEA. The district court held that Tramp's own evidence demonstrated that age and health care costs were analytically distinct in this case and thus Associated Underwriters was motivated by factors other than age in its termination of Tramp. The court noted that because Associated Underwriters' premiums were in fact not reduced after Tramp's termination during the 2009 RIF, factors other than age necessarily affected health care costs and thus age could not have been the "but-for" cause of Tramp's termination. As to the ADA claim, the district court held that even assuming an issue of fact remained as to whether Tramp is disabled under the ADA in the first instance, which the court highly doubted, Tramp did not establish that her termination was motived by her disability. The court arrived at the latter determination by again applying Hazen Paper, ruling that like the ADEA claim, Tramp's evidence demonstrated that Associated Underwriters terminated her to save health care costs, and not because she was disabled–that the two are analytically distinct.

## II.    DISCUSSION

We review de novo the district court's grant of summary judgment to Associated Underwriters, viewing the facts in the light most favorable to Tramp and

under the ADEA and ADA. We follow suit.

giving her the benefit of all reasonable inferences. <u>Robinson v. Am. Red Cross</u>, 753 F.3d 749, 754 (8th Cir. 2014). "We may affirm only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> (internal quotation omitted). As relevant to her claims, "[t]he ADEA prohibits discrimination against employees, over the age of 40, because of their age," <u>Holmes v. Trinity Health</u>, 729 F.3d 817, 821 (8th Cir. 2013), and the ADA makes it unlawful for a covered employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

## A. Dispute Regarding the Factual Standard

Tramp first claims that the district court erred in failing to consider her submitted facts; what she labeled as "additional material facts" in her brief opposing summary judgment. Tramp alleges, without reference to specific legal or statutory authority, that even though local rule 56.1(b)(1) states that "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response," Neb. Civ. R. 56.1(b)(1), the same is true for any additional facts alleged by the non-moving party. Tramp deduces that because this court views the facts in the light most favorable to the non-moving party in a summary judgment determination, any additional factual allegations made by that non-moving party cannot be disputed–that if the non-moving party includes proper references to the submitted record, her facts are to be "deemed admitted" and viewed in her favor.

At the outset, Tramp fails to acknowledge that the rules clearly require that she respond in kind, and in a specific fashion, to the statement of undisputed facts asserted by Associated Underwriters in their motion for summary judgment. Nebraska's rule concerning summary judgment procedure places clear requirements on the moving and opposing parties. The moving party, for example, "must include in the brief in support of the summary judgment motion a separate statement of

material facts," that "consist[s] of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." Neb. Civ. R. 56.1(a)(1) & (2). Associated Underwriters complied with this rule.

include in [her] brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which [Tramp] relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

Neb. Civ. P. 56.1(b)(1). Tramp's inclusion of "additional material facts" in her opposing brief did not comply with these requirements. Although numbered and referenced with pinpoint references, nowhere in Tramp's fact section does she dispute any undisputed fact advanced by Associated Underwriters. Accordingly, the district court properly considered the movant's material facts admitted.

Possibly, Tramp means to argue that all of her additional facts were, indeed, additional, and that she, in fact, had no dispute as to the facts set out by Associated Underwriters so there was no need to reference any disputed paragraphs; that she truly included additional facts that the district court wholly failed to consider. Yet, there are many paragraphs in Tramp's "additional material facts" portion of her brief that directly seek to refute those advanced by Associated Underwriters. Per the local rules, the additional facts, when possible, should have referenced the exact paragraph

of the "undisputed facts" at issue so as to avoid the very problem we now face–that is, discerning which of Tramp's additional facts are truly additional and which respond to facts advanced by Associated Underwriters, thus placing them in dispute. Nw. Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003) (noting that the "concision and specificity required by [local rules] seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge").

District courts have discretion to enforce local rules and we do not fault the district court for doing so in this case. Reasonover v. St. Louis Cnty., Mo., 447 F.3d 569, 579 (8th Cir. 2006). At the same time, however, it is apparent from the district court's order that the court exercised lenity, as it can, and considered facts contained in Tramp's brief in opposition to Associated Underwriters motion for summary judgment. Accordingly, the court did not ignore Tramp's facts, it just did not spend any time parsing through them to discern which were included to refute facts advanced by Associated Underwriters. Importantly, the court references Tramp's filing, and many facts therein, throughout its analysis. For example, the court analyzed the emails from Gurbacki that Tramp argues bolsters her discrimination claims in this matter. We hold the district court committed no abuse of discretion and we likewise exercise lenity in similar fashion, reviewing facts presented by Tramp as relevant to our analysis herein.

**B.      ADEA**

Tramp claims that Associated Underwriters terminated her because her age affected its employee health insurance costs. To establish a claim under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009). The familiar McDonnell

Douglas test still applies in ADEA cases. Applying that test to this reduction-in-force situation,

> [Tramp] must first establish a four-part prima facie case of age discrimination. To establish a prima facie case of age discrimination in a reduction-in-force, [Tramp] must show that (1) [s]he is over 40 years old, (2) [s]he met the applicable job qualifications, (3) [s]he suffered an adverse employment action, and (4) there is some additional evidence that age was a factor in the employer's termination decision. Once [Tramp] establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the employer does so, [Tramp] must show that the employer's proffered reason was pretext for discrimination.

Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 (8th Cir. 2011). "At all times, [Tramp] retains the burden of persuasion to prove that age was the 'but-for' cause of the termination." Id.; Gross, 557 U.S. at 177-78.

Here, the first three elements are undisputed. As to the fourth element, and ultimately to prevail on her burden of proving that age was the but-for cause of Associated Underwriters adverse decision, Tramp claims that Gurbacki's correspondence with the company's health care provider months before and months after Tramp's termination provides the additional evidence necessary for a fact-finder to deduce that there was a direct correlation between employee age and the termination decision–that it was the but-for cause of her termination. Gross, 557 U.S. at 177-78. We agree that an issue of fact remains given the record evidence.

As noted above, during the summer of 2008, seven months prior to Tramp's termination, it became apparent to management that its health care premiums were affected by the demographics of its employees. In correspondence with the health care provider, Gurbacki wrote: "We have lost several of the older, sicker employees

and should have some consideration on this. If you have provided us with your final rates then that is what we will use in our decision." Then, in August 2008, Hallgren met with Tramp and others and suggested that they utilize Medicare instead of the company's health care plan. Nearly five months after Tramp's termination, there is again email correspondence between Gurbacki and the health care provider discussing the high renewal rates for Associated Underwriters. In it, as relevant here, Gurbacki writes, "[s]ince last year we have lost our oldest and sickest employees . . . . Please let me know if this is the best we can do . . . ."

Tramp claims that Associated Underwriters' expected reduction in health care premiums demonstrates that the but-for cause in Tramp's termination was not poor performance but rather her age. The district court held that Tramp failed in this endeavor of proving but-for causation, determining that this evidence, too, ultimately proves that Associated Underwriters' decision was motivated purely by health care costs, which are positively correlated with age, but analytically distinct. See Hazen Paper, 507 U.S. at 611.

"[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Gross, 557 U.S. at 176; see also Hazen Paper, 507 U.S. at 610 ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process *and had a determinative influence on the outcome*." (emphasis added)). There can be no discrimination under the ADEA "[w]hen the employer's decision *is* wholly motivated by factors other than age . . . even if the motivating factor is correlated with age," at least when age is analytically distinct from the motivating factor. Hazen Paper, 507 U.S. at 611. The ADEA statute does not permit mixed-motives age discrimination claims. Gross, 557 U.S. at 177 n.3. This is not to say that age must have been the *only* factor in the employer's decisionmaking process, but only that, as among several

factors, age was the factor that made a difference. <u>Wilkerson v. Shinseki</u>, 606 F.3d 1256, 1266 (10th Cir. 2010).

In <u>Hazen Paper</u>, the plaintiff claimed that in an attempt to avoid paying his benefits, the company terminated him shortly before his pension was to vest based on his years of service with the company. 507 U.S. at 606-07. The Court explained that "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." <u>Id.</u> at 610. So, "[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly." <u>Id.</u> at 611. As noted by the district court, "[w]hen the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." <u>Id.</u> In <u>Hazen Paper</u>, the Court held that because pension plans typically provide that an employee's benefits accrue, or "vest," once the employee completes a sum certain of years of service with the employer, it is often, but certainly not always, correlated with age. <u>Id.</u> As the Court explains, "an employee's age is analytically distinct from his years of service." <u>Id.</u> For example, "[a]n employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA . . . may have worked for a particular employer his entire career, while an older worker may have been newly hired." <u>Id.</u> In that instance, an employer can thus take into account one factor while ignoring the other and in that sense, the two are analytically distinct. Because of that distinction, the Court held that it is thus "incorrect to say that a decision based on years of service is necessarily 'age based'" in violation of the ADEA. <u>Id.</u>

The same analysis, however, is not true for age and health care costs. Most accurately in this case, Associated Underwriters' perception of insurance premiums are not divorced from age in the same sense that pension benefits are divorced from age. Here, there remains at least a question of fact as to Associated Underwriters'

-12-

motivations for terminating Tramp. Age and health care costs are not so analytically distinct if Associated Underwriters presumed the rise in one necessitated a rise in the other. See Erie Cnty. Retirees Ass'n v. Cnty. of Erie, Pa., 220 F.3d 193, 211 (3d Cir. 2000) (discussing a case involving Medicare status as a direct proxy for age parallel to the "special case" mentioned by the Court in Hazen Paper, where an adverse action is taken against a person because of a particular event that occurs because the person has attained a certain age). Certain considerations, such as health care costs, *could* be a proxy for age in the sense that if the employer supposes a correlation between the two factors and acts accordingly, it engages in age discrimination. Hazen Paper, 507 U.S. at 612-13. Here, it is possible that a reasonable jury could conclude from the evidence that Associated Underwriters believed the two considerations were not analytically distinct. EEOC v. City of Independence, Mo., 471 F.3d 891, 896 (8th Cir. 2006) ("The key is what the employer supposes about age . . . ."). This is not to say that discrimination occurred here, but that summary judgment prematurely disposed of the issue.

We agree with the district court that at the very least Gurbacki's choice of words–questioning whether "this is the best we can do" after pointing out that they had lost their "oldest and sickest employees," and how Associated Underwriters expected a rate decrease "from the group becoming younger and healthier"–was crude and perhaps an insensitive way to describe the composition of the then-current employees to the health care provider. But, there remains a possibility that these statements could also be a manifestation of discriminatory intent in the process used by Associated Underwriters to be rid of its older (and/or oldest) employees in general. The emails are open to interpretation and on a motion for summary judgment, they must be viewed in the light most favorable to Tramp. One could deduce from Associated Underwriters' own inquiries that it believed that as the age of employees

increased so too did health care premiums.[4]  Tramp raises a genuine issue of material fact as to what Associated Underwriters supposed about age in making its employment decisions.  Hazen Paper, 507 U.S. at 612.

Associated Underwriters additionally argues that the six-month "gap" that transpired between Tramp's refusal to use her Medicare benefits in place of the company's health care plan and her termination is too long as a matter of law to establish a causal connection, and that Tramp offers nothing else to establish that element.  Yet, the gap may not be so big, especially when Tramp is not relying solely on a claim for retaliation, but rather discrimination, generally, based on her age.  There remains a question of fact here, too.  Already discussed, there are emails from the summer of 2008 revealing a dialogue between Gurbacki and Associated Underwriters' health care provider regarding the loss of the older, sicker employees and the expectation of consideration for that loss in the way of reduced premiums.  Additionally, Tramp highlights the request from Hallgren in July 2008 for Tramp to go on Medicare with the addition of supplemental insurance from Associated Underwriters, along with the formal reprimand and subsequent probationary period for Tramp beginning in October 2008 and ending in January 2009, and Tramp's ultimate termination a few days later in February 2009, shortly after being taken off probationary status.  Tramp also provides deposition testimony to argue that prior to her written reprimand and probationary status, Associated Underwriters did not give any such reprimands, verbal or written, to any other employee, and that Gurbacki

_____

[4]The district court pointed out that, in fact, such a supposition is not true, as evidenced by the fact that Associated Underwriters' health care provider was unable to lower its premiums despite Tramp's termination because the 2009 RIF reduced enrollment in Associated Underwriters' health plan and thus the premiums were to increase even more.  This evidence certainly demonstrates that factors other than age affect health care costs, but this post-termination evidence does nothing to allay or resolve what Associated Underwriters itself believed to be the correlation when it was making its termination decisions in the first instance–the crux of the instant query.

-14-

could not remember any other employee prior to Tramp being placed on probation. Then, in the summer of 2009 when discussing renewal rates, there are additional emails regarding Associated Underwriters' desire for a reduction in premiums while simultaneously pointing out that it had "lost [its] oldest and sickest employees."

We do not need to exhaust the record to deduce that a reasonable jury could arrive at different conclusions regarding Associated Underwriters' intent on these facts, and others, presented in the record. Again, this is not to say that Tramp has established her claim as a matter of law; just that there remains an issue of fact. Even though a gap in time between protected activity and an adverse employment action can weaken an inference of retaliation, there is great difficulty in placing too much reliance on timing as evidence of causation. Stewart v. Ind. Sch. Dist. No. 196, 481 F.3d 1034, 1044 (8th Cir. 2007). Most often, temporal proximity is discussed in retaliation claims, where there is a protected activity claimed to have triggered an adverse employment action. See Lors v. Dean, 746 F.3d 857, 865-66 (8th Cir. 2014) (discussing the import of temporal proximity in retaliation cases). Here, there may not even be a "gap" such as is usually contemplated by the jurisprudence discussing temporal proximity, given the presentation of ongoing occurrences in this discrimination action. We thus leave it to the fact-finder to place weight, if any, on the time frame at play as it relates to Tramp's retaliation and discrimination claims.

Tramp has additionally created an issue of fact as to pretext. Associated Underwriters claim that it terminated Tramp due to the 2009 RIF and that Tramp was chosen because she was the poorest performer in her group. Yet, if believed, Tramp's written reprimand and probationary status were imposed contrary to Associated Underwriters' practice. That is, she argues that there was no such practice prior to the process imposed on Tramp in the fall of 2008. Perhaps more tenuously, Tramp argues that Associated Underwriters did not need to engage in the RIF resulting in

-15-

Tramp's termination.[5]  Under the ADEA at the pretext stage, "proof that the explanation is false is necessary, but not sufficient, to show a pretext for discrimination under the ADEA. . . . [T]he plaintiff must show that the employer's stated reason was false and that age discrimination was the real reason." Tusing v. Des Moines Indep. Cmty. Sch. Dist. , 639 F.3d 507, 516 (8th Cir. 2011).  At bottom, it is possible that a jury could view the evidence presented here as evidence of pretext–that Tramp's poor performance and the RIF itself were a ruse to mask unlawful discrimination in this case.  The critical factor is that, given the evidence presented, it is not for this court to decide whether age actually played a role in Associated Underwriters' decisionmaking process and had a determinative influence on Tramp's termination.

All of these facts, construed in Tramp's favor, "assume greater probative value on a motion for summary judgment."  Baker v. Silver Oak Senior Living Mgmt. Co., 581 F.3d 684, 689 (8th Cir. 2009).  The elements of Tramp's prima facie case are present and the evidence is sufficient to allow a reasonable jury to reject Associated Underwriters' non-discriminatory explanations.  Accordingly, the "ultimate question" of discrimination must therefore be left to the trier of fact to decide.

## C.   ADA

Tramp additionally challenges the district court's adverse grant of summary judgment on her disability discrimination claim under the ADA.  Tramp bases this

---

[5]Certainly, when "a company exercises its business judgment in deciding to reduce its workforce, it need not provide evidence of financial distress to make it a legitimate RIF." Rahlf, 642 F.3d at 639 (quotation and internal quotations omitted). Accordingly, such an argument is maybe more tenuous, but Tramp uses this evidence as further circumstantial evidence to rebut Associated Underwriters' claim that its decision was purely motivated by cutting health care costs.  Suffice it to say that an issue of fact remains and we need not resolve the matter today.

claim on knee pain that she claims limited her ability to perform her daily tasks and for which she scheduled arthroscopic knee surgery that she claims would have limited her activity even more during recovery. She claims that Associated Underwriters terminated her one day before her scheduled surgery because of its perception that it had to get rid of its oldest and sickest employees and that it regarded her as disabled.

"To establish discrimination under the ADA, an employee must show that she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of her disability." Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). "The definition of disability in [the ADA] shall be construed in favor of broad coverage . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "The ADA defines a disability as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such impairment, or being regarded as having such an impairment." Norman v. Union Pacific R.R. Co., 606 F.3d 455, 459 (8th Cir. 2010); see also 42 U.S.C. § 12102(1). "[T]hough the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one." Neely v. PSEG Tex., Ltd. P'ship, 735 F.3d 242, 245 (5th Cir. 2013) (second and third alterations in original). Under the ADA as amended,

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

The district court dismissed Tramp's ADA claim. First, the court concluded that it was "highly doubtful" that Tramp demonstrated a disability covered by the ADA. Even assuming an issue of fact remained as to her disability, the court

-17-

continued, she did not establish that her termination was motivated by her disability. We agree. Leaving aside a determination as to whether Tramp's knee pain and future surgery recovery would qualify as a disability under the now more lenient standards of the ADA as amended, Tramp is unable to sustain a claim. Tramp offers very limited evidence to prove the allegation that Associated Underwriters regarded her as disabled in violation of the ADA. Tramp alleges that she told an office employee (the employee through which Tramp requested time off) that she was going to take off three days for a knee surgery in February. And, she maintains that the timing of her termination the day before her scheduled surgery is probative evidence that Associated Underwriters perceived her surgery as a disability and more serious than it actually was, resulting in higher insurance costs for the company.

As a matter of law this claim fails because there is no evidence Associated Underwriters terminated her employment "on the basis of disability." 42 U.S.C. § 12112(a). Tramp offers no evidence other than her own testimony that others were "generally aware" of her scheduled surgery, that anyone else knew about the surgery or, more importantly, that such knowledge affected decisions regarding Tramp's employment or that they regarded her as impaired. At a minimum, Tramp must show that the decisionmakers knew about her alleged disability. Kozisek v. Cnty. of Seward, Neb., 539 F.3d 930, 936 (8th Cir. 2008). And in the end, even awareness of the scheduled surgery, without more, is not enough to maintain this claim. Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 736 (8th Cir. 2010). Too, here, the temporal proximity is not enough to carry the day along with the remaining sparse evidence. See Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1114 (8th Cir. 2001).

Tramp also challenges Associated Underwriters' argument that it is improper to impute the office bookkeeper's knowledge to the requisite decisionmakers here. She claims this argument is merely a disguised "cat's paw" defense used to the company's advantage and that a question of fact remains on this issue. See Staub v.

-18-

<u>Proctor Hosp.</u>, 131 S. Ct. 1186, 1194 (2011) (holding that if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has "cat's paw" liability). However, Tramp's allegation is misplaced on this record and falls short. Accordingly, we affirm the district court's dismissal of Tramp's ADA claim.

## III.  CONCLUSION

As to the district court's grant of summary judgment in favor of Associated Underwriters, we reverse in part, affirm in part and remand for further proceedings consistent with this opinion.

_____